**THIRD NATIONAL BANK**

v.

**The WINNER CORPORATION and the Industrial Development Board of the County of Dickson, Tennessee.**

**Civ. A. No. 78–3162.**

United States District Court,
M.D. Tennessee,
Nashville Division.

Oct. 25, 1982.

Thomas M. Evans, Charles H. White, Nashville, Tenn., for plaintiff.

Wilson Sims, Nashville, Tenn., Robert S. Clement, Dickson, Tenn., for defendants.

## MEMORANDUM

JOHN T. NIXON, District Judge.

Plaintiff-appellant, Third National Bank (hereinafter referred to as "Bank") appeals from the Judgment and from the Memorandum and Order of the Honorable Paul E. Jennings, Bankruptcy Judge, dated March 28, 1978. The Judgment, Memorandum, and Order were entered following the proceedings of *In re The Winner Corporation, etc., Debtor,* Docket No. BK 73–1646 (M.D. Tenn.), under Chapter XI of the Bankruptcy Act of 1898, formally 11 U.S.C. §§ 701, *et seq.* The Bankruptcy Court found that the Bank was entitled to no damages resulting from the rejection of its lease to The Winner Corporation, formerly known as Winner Boats, Inc. (hereinafter referred to as "Winner"). For the reasons set out below, this Court affirms in part and reverses in part the decision of the Bankruptcy Court and remands this case to that Court for its consideration consistent with the findings herein.

On December 4, 1973, Winner filed a petition under Chapter XI of the Bankruptcy Act, 11 U.S.C. §§ 701, *et seq.* and a plan of arrangement, which identified three major classes of creditors and which the Court accepted on February 25, 1974. Subsequently, minor changes in the plan were made and the Court confirmed a Modified Plan of Arrangement on April 30, 1974. On December 2, 1976, Winner requested another modification in its plan in order to reduce the amount for class three (general and unsecured) creditors from 100 percent to 20 percent. On December 3, 1976 Winner abandoned the premises covered by the lease, which is the subject of the instant dispute, and left a separate, successor corporation, Winner Boats, Inc., in possession of approximately one-third of the building. The Bankruptcy Court confirmed this final plan on April, 1977 but conditioned it on the resolution of the instant dispute. Interestingly, none of the plans submitted to the Bankruptcy Court mentioned the lease.

The lease in question was executed on September 1, 1968, and subsequently amended twice, once on June 1, 1969, and again on September 1, 1972, to cover the costs of modifications to the physical plant, to lease additional plant space to Winner, and to lengthen the term of the lease and raise the rent.

The resulting lease began on September 1, 1968, and would have ended on September 30, 1992. The monthly rent varied from a high of $15,796.27 to a low of $6,390.01. The variation in rent occurred because the rent was tied to the retirement of the bonds which were used to finance the construction of the plant which Winner occupied. This lease is known as an industrial development bond lease which allows the landlord to receive as rent under the lease only the amount that is actually required (including all interest payments) to retire the bonds that are issued to fund the project. The second supplemental lease contained the following provision: "[u]pon retirement of all such Bonds both as to principal and interest, or when sufficient money is available in the Bond Fund, Reserve Fund and the Series 1972 Bonds Reserve Fund to retire all outstanding Bonds, no rental payments shall be due hereunder during the remainder of the original term of this lease." Memorandum and Order at 6 (additional comments by Court omitted). If the bonds could have been retired prior to 1992, Winner would have been able to use the plant rent free until the lease period ended. Thereafter, Winner would have been able to rent the plant for a nominal annual rent of $100. In essence, Winner had an extremely favorable lease arrangement toward the end of, and after, the lease period. The rent, therefore, was strictly tied to the timely retirement of the industrial revenue bonds issued by the Industrial Development Board of the County of Dickson, Tennessee

(hereinafter Board). When Winner's rents created enough capital to pay off the bonds, for all practical purposes Winner would pay no rent.

After Winner abandoned the plant on December 3, 1976, it filed a petition with the Bankruptcy Court to reject the lease and to determine the amount of damages due to the Bank as indentured trustee for the bondholders of bonds issued by the Board. The evidence clearly supported Winner's right to reject the lease, and the Bank does not object to the Court's finding of Winner's right to reject. Instead, the Bank objects to the findings by the Court that December 3, 1976, was the legal date of abandonment and that no damages are due to the Bank as a result of the rejection and the unpaid rent prior to the rejection.

Section 353 of the Bankruptcy Act, 11 U.S.C. § 753, states the formula for determination of maximum damages when a lease has been rejected under bankruptcy. It provides that such damages

> ... shall be provable, but shall be limited to an amount not to exceed the rent, without acceleration, reserved by such lease for three years next succeeding the date of the surrender of the premises to the landlord or the date of reentry of the landlord, whichever first occurs, whether before or after the filing of the petition, plus unpaid accrued rent, without acceleration, up to the date of surrender or reentry....

Two important points obviously emerge from a reading of Section 353. First, damages are limited to the sum of the rent without acceleration for the three years immediately following the surrender of the premises to the landlord plus accrued unpaid rent, without acceleration, as of the date of surrender. Therefore, this sum is the *maximum* amount to which the Bank is entitled. As the Bankruptcy Court stated: "[s]ection 353 does not impose an absolute measure of damages, but only sets *a maximum limit* above which damages may not rise." Memorandum and Order at 9. Second, the damages must be proved.

Under Section 353, the Bankruptcy Court must make three determinations. First, it must determine the date of surrender or reentry by the landlord, whichever is first. Second, the Court must determine the amount of rent reserved under the lease for the three years immediately after the surrender plus the unpaid accrued rent. Third, the Court must ascertain the actual damages of the landlord. In determining the actual damages, (among other steps) one must subtract the present rental value for the remainder of the term of the lease discounted to present value from the value of the rent reserved in the lease, also discounted to present value. *Miller v. Irving Trust Co.,* 296 U.S. 256, 258, 56 S.Ct. 189, 189, 80 L.Ed. 211 (1935) and *Kuehner v. Irving Trust Co.,* 299 U.S. 445, 450, 57 S.Ct. 298, 300, 81 L.Ed. 340 (1937). This third step anticipates mitigation of damages by the landlord. Each one of those three steps is considered below in that order.

First, the Court examines the issue of surrender. In the instant case, the Bankruptcy Court rejected the Bank's argument that "surrender" for purposes of Section 353 can occur only when the Court has allowed rejection of the lease by Winner. On appeal the Bank relies heavily on *In re United Cigar Stores Co. of America,* 86 F.2d 629 (2nd Cir.1936). That case involved a bankrupt tenant who had subleased the property to a number of subtenants. Under the lease, the tenant was required to pay a monthly rental plus, "as rent", repairs, maintenance, and taxes on the premises. *Id.* at 631. The trustee for the tenant obtained an order authorizing rejection of the lease and at that point the Court ruled that a surrender of the premises had occurred in fact. *Id.* at 632. That Court noted that the law (which was similar to Section 353) allowed for the three year limitation to begin either upon surrender by the tenant or reentry by the landlord. *Id.* But because the tenants were never in actual possession, they could not surrender the premises. *Id.* The landlord claimed that the three year limitation began to run on its reentry, not on the rejection. *Id.* The Court, however, ruled that constructive sur-

render has occurred "when the landlord is free to deal with the property as he chooses, and not ... [at] technical surrender...." *Id.* In the instant case, the Bank has cited *United Cigar Co.* for the proposition that de jure surrender occurs only when the Bankruptcy Court approves the rejection. Such a conclusion is not supported by the statute or the reasoning of *In re United Cigar Co. of America.* There are no subtenants in the instant case; Winner was in actual possession at the time of surrender; and, the Bank was free to deal with the property as of the date of actual surrender and did not have to wait until the Bankruptcy Court approved the rejection. This Court affirms the date of surrender determined by the Bankruptcy Court.

Having established the date of surrender, the Bankruptcy Court next addressed the question of the maximum amount of damages which the Bank could be awarded under Section 353. The Bankruptcy Court approximated the three-year rent figure at $477,000 and the unpaid accrued rent at $381,620.92 plus interest on defaulted bonds amounting to $6,850.01 (that interest was expressly a part of the rent) for a Section 353 ceiling total of $865,470.93.

Having properly established the maximum amount which the Bank could claim as damages, the Court sought to establish the actual damages of the Bank. In *Aristo Foods, Inc. v. Union National Bank,* 1 B.C.D. 345, 350 (Bkrtcy.W.D.Mo.1974), the Court set out the process by which actual damages are provable:

> The several steps in fixing damages for breach of a lease under Sec. 353 would be: (1) find the rent due for the balance of the term, discounted at present worth, (2) find the present fair rental value for the balance of the term, discounted at present worth, (3) subtract (2) from (1). The result will be the lessor's actual damages. (4) Then multiply the annual rent under the lease by 3 and add to this figure any unpaid accrued rent.

The lesser of (3) or (4) will be the maximum allowable damages.

*Id.* at 350.

The evidence of the present rental value of the property at abandonment presented at the trial by Winner was unconvincing to the Bankruptcy Court and as the Judge repeatedly emphasized, the Bank presented no evidence as to the property's present value. Under those conditions, the Court resorted to the established policy that in the absence of convincing evidence to the contrary,. the contractually reserved rent is considered reasonable. *S & W Holding Co. v. Kuriansky (In re W.L. Boffa, Inc.),* 317 F.2d 666, 667 (2d Cir.1963); *Aristo Foods, Inc.,* 1 B.C.D. at 350. As a result, the Bankruptcy Court found that the contractually reserved value and the present value were identical. Thus, the Court concluded:

> [s]ubtraction of the present fair rental value from the value of the rent due for the balance of the term, leaves zero. Zero is the amount of the Bank's *actual damages.* It is obvious that zero is less than the $865,470.93 ceiling imposed by § 353. Zero is the measure of the Bank's damages in this case. (*Emphasis added* ).

Memorandum and Order at 14.

Having ascertained that the Bank incurred no legal damages, the Bankruptcy Court stated that if "it be later contended that any part of rent falls into a priority classification and thus, should be excluded from the accrued unpaid calculations above, the Court finds none of the rent should be classified as priority or administrative expense." *Id.* This section apparently was included to avoid remand in the event that the Bankruptcy Court's calculation of damages was found in error on appeal. Unfortunately, for the reasons discussed below, this Court is unable to take advantage of that analysis.[1]

■ In reviewing the record and the conclusions of law based upon it, this Court concludes that the *Aristo Foods* test and the lower Court's reliance on it are in error. There is no definition in the Bankruptcy

---

1. *See* the discussion of determining present value at 387 *infra.*

statutes as to what constitutes "damages"; and neither counsel nor the Bankruptcy Court refer to any provision defining damages. On a fundamental level, obviously total damages equal "past" damages plus "future" damages.[2] Under the test used in *Aristo Foods* to determine "actual damages", the Court merely (1) subtracted the present value for the term remaining under the lease from (2) the rent reserved under the lease for the term remaining under the lease. 1 B.C.D. at 350. If the difference was greater than the § 353 ceiling, the Court awarded the ceiling as damages; otherwise, the "actual damages" were awarded. *Id.* Under this test the Court failed to consider *any* past damages in the calculations of "actual damages." It is true that the Court considered the unpaid accrued next in setting the § 353 damages, but it then failed to consider unpaid accrued rent in its calculations of actual damages. In drafting § 353, Congress obviously intended the Court to consider unpaid accrued rent ("past" damages) in establishing the ceiling damages. If the Congress intended that unpaid accrued rent be included in ceiling on damages, this Court feels that it is highly unlikely that Congress intended to exclude such claims from actual damages. Exclusion of past damages in the determination of actual damages for rejected leases has no basis in the Bankruptcy laws. Therefore, the Court rejects the *Aristo Foods* test and proffers the following test:

(1) determine the rent due (reserved value) for the term remaining under the lease, discounted to present worth,

(2) determine the present fair rental value for the term remaining under the lease, discounted to present worth,

(3) subtract (2) from (1) (this difference is the lessor's "future" damages),

(4) determine "past" damages (including unpaid accrued rent, etc.),

(5) add (4) to (3) (this sum equals "actual" total damages),

(6) determine the § 353 ceiling,

(7) the lesser of (6) or (5) will be the maximum allowable damages.

Not only does this Court believe that this process is consistent with the bankruptcy code and the intent of Congress, but it also believes that it is a more equitable result. Under the *Aristo Foods* test a lessor who had been unable to collect a large amount in back rent from a bankrupt tenant would be treated the same as a lessor who was owed no back rent. Not only is this result unfair to the lessor who has incurred great unpaid accrued rent, but it also may, under certain circumstances, encourage lessors to increase pressure for timely payment of rent on marginal tenant-corporations who, without such pressure, might be able to avoid declaring bankruptcy.

Having rejected the *Aristo Foods* test, this Court will address the determination by the lower Court of the present value of the term remaining under Winner's lease. This Court is unable to determine why the lease value throughout the remaining years of the lease was chosen as the present value of the property for the remainder of the term. Several points, however, are clear from a careful reading of the Bankruptcy Court's decision. First, only Winner offered evidence of the present value of the property. The Bank offered no evidence on this point. Second, Judge Jennings was "convinced the figure presented [by the Winner witness] is too high in light of the effective cross-examination by counsel for the Bank". Memorandum and Order at 13. Based on that determination, the Court turned to the lease and concluded that (citing *Aristo Foods*), " 'the present rental value is the same as that called for in the lease until contrary evidence is adduced.' " *Id.* Although, the lease was not part of the Record on Appeal, perhaps the Bankruptcy Court felt that the *lowest* conceivable

---

**2.** The Court acknowledges that the use of the terms "past damages" and "future damages" is not an artful way to express the question of actual damages; nevertheless the Court finds that this use of terms most clearly expresses the argument of the Court. As used herein, "past" damages are damages incurred prior to abandonment; "future" damages are damages anticipated after abandonment.

present value for the term remaining under the lease was the amount due for the term remaining under the lease; thus in light of the Bankruptcy Court's determination that no past damages were to be considered under the *Aristo Foods* test, perhaps it saw no need to establish a value higher than the lease value because the result in any case would be the same.[3] In light of this Court's ruling of law in regard to the *Aristo Foods* test, however, the present value for the term remaining under the lease takes on crucial significance. If the present rental value of the property is in fact greater than the value reserved under the lease, then it would reduce the total damages suffered by the Bank.[4] Perhaps the Bankruptcy Court had reason to conclude that the 1977 value of 67 cents per square foot (presumably not the .67 cents discussed in the opinion) would fall to only 33 cents in 1985, but, if so, the evidence used in such a determination is not apparent to this Court. Memorandum Order at 13.[5]

This Court has great respect for the factual findings of the Bankruptcy Court and intends to show great deference toward it. Each party has presented factual evidence to support its position, which evidence is not included in the Record on Appeal; thus, it has become impossible for this Court to determine what evidence and arguments were presented before the Bankruptcy Court when it concluded that the present value for the term remaining under the lease was equal to the rent reserved for the term remaining under the lease. Furthermore, there was incomplete description of the various "funds" under the lease, how much was in those funds, and how they affected the claim for actual damages. (*See* Memorandum and Order at 6.) In fact, as noted above, this Court was not able to find a copy of the lease in question in the Record on Appeal. Even if all these deficiencies in the Record on Appeal were cured, however, this Court would still be reluctant to invoke the clearly erroneous rule. Thus on remand, this Court suggests that the lower Court give close attention to that finding of fact to ascertain if the present value remaining under the lease is in fact the same as the lease value.

This Court realizes that the overall result may well be the same—that is, that the Bank may be entitled to no damages.[6]

---

3. For example, if the present value of the term remaining under lease were *greater* than the value reserved under the lease, the amount owed the Bank by Winner would be a negative sum. No matter how great that negative sum, the Bankruptcy Court would find only zero damages.

4. Consider, for example, the following three possibilities where the ceiling damages of $865,470.93 and the actual damages of $388,470.93 are found. (1) Where the present value of the term remaining under lease at abandonment equals exactly the amount reserved for the same term, the award would be $388,470.93. (2) Where the present value of the term remaining under the lease (including the discounting to present value) exceeds the amount reserved for the same term under the lease (also including the discounting to present value) by $488,470.93, the actual damages would be "minus $100,000", or an actual award of $0. (3) Where the present value of the term remaining under the lease (including the discounting to present value) is less than the amount reserved for the same term under the lease (also including the discounting to present value) by $200,000, the actual damages and award would be $588,470.93.

5. The Bankruptcy Court, of course, was not required to accept either the amount offered in evidence or the amount reserved under the lease. *See, e.g., Aristo Foods,* 1 B.C.D.

6. For example, if the present value of the property at abandonment was $.67 per square foot per year for the entire term remaining under the lease, then for the 232,000 square feet involved, the present value (before discounting) would be $155,440 times approximately 15 years remaining under the lease, for a total of $2,331,600. From this, perhaps two years' value, ($310,880, also before discounting), could be deducted for the delay in finding a new tenant. The total present value (before discounting) would be $2,020,720. The Bankruptcy Court found the contractually reserved rental value to be $1,319,000 (before discounting). Memorandum and Order at 13–14. The actual "future" damages before discounting would be minus $701,720. This would be added to the past damages of $388,470.93 (the accrued, unpaid rent) for a total amount of damages suffered by the bank of minus $313,249.07. If these are, in fact, the findings, then the Bank has incurred no actual damages. Whether such findings may be made, however, is a matter to be determined by the Bankruptcy Court on remand.

Nevertheless, the Court also recognizes that the factual finding of the trial Court entitled to great deference on appeal, especially in bankruptcy cases. This Court acknowledges the complexity of bankruptcy cases, including the instant one, and Congress's intent to provide litigants in bankruptcy cases with a specialized court in which to hear their complex claims. This Court is convinced, however, that the test used in *Aristo Foods* constituted an error as a matter of law. Fearful that simply ruling on the question of law may lead to an inequitable result and mindful of the basically equitable character of the bankruptcy proceedings, this Court remands this case for consideration consistent with this opinion. An ORDER will be entered simultaneously with this Memorandum.